IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA     )
     )
     )   NO. 3:13-cr-00048
v.     )
     )   JUDGE RICHARDSON
     )
CHARLES WARD, JR.     )

## MEMORANDUM OPINION

Pending before the Court is Defendant's renewed Motion for Compassionate Release (Doc. No. 63, "Motion"),[1] whereby Defendant seeks a reduction of his 262-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP"), pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to his specific situation (namely, his being nearly 64 years old and his particular health profile), satisfies the requirement of "extraordinary and compelling reasons" necessary for this Court to grant "compassionate release" under Section 3582(c)(1)(A)(i), and that compassionate release is otherwise appropriate in his case. The Government has filed a response in opposition (Doc. No. 69, "Response"), arguing that the motion is not yet cognizable by this Court, that Defendant has not shown as required "extraordinary and compelling reasons" for compassionate release or that he is not a danger to the

---

[1] A motion under Section 3582(c)(1)(A) is actually a motion for a reduction in sentence, including but not limited to reductions that would result in the defendant-movant's immediate release. The grant of a motion for sentence *reduction* under Section 3582(c)(1)(A) would not necessarily result in the defendant's immediate *release*. *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020). Nevertheless, such motions generally are known as ones for "compassionate release." *Id.* at n.2 ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020). This reflects the fact they typically do seek immediate release rather than a mere reduction in sentence that would result in an earlier release someday but not immediately.

safety of other persons, and that other applicable considerations counsel strongly against

compassionate release. (Doc. No. 69). Defendant has filed a reply (Doc. No. 74) to the

Government's response.

PROCEDURAL BACKGROUND

On March 6, 2013, Defendant was charged in a one-count Indictment charging possession

of a firearm subsequent to a felony conviction, in violation of 18 U.S.C. § 922(g)(1) and 924. (Doc.

No. 1). Defendant was found guilty by a jury on December 10, 2013. As the Government

accurately describes the summary of proof at trial contained in the Presentence Investigation

Report regarding the incident of possession constituting the offense:

> Specifically, [Defendant] lifted his shirt to show a loaded gun to a man during a
> confrontation. When this man retrieved another person who yelled at [Defendant],
> [Defendant] pulled out the gun and pointed it at both of them. When law
> enforcement arrived, [Defendant], who was walking down the street, threw a loaded
> Bryco 9 mm pistol to the ground.

(Doc. No. 69 at 2) (citation omitted). As described by the Sixth Circuit when it later confirmed his

conviction and sentence:

> The district court calculated the advisory guidelines range as 262 to 327 months of
> imprisonment based on a total offense level of 34 and a criminal history category
> of VI; [Defendant] qualified as an armed career criminal under 18 U.S.C. § 924(e)
> and USSG § 4B1.4. After considering the sentencing factors under 18 U.S.C. §
> 3553(a) and argument from counsel, the district court sentenced [Defendant] to 262
> months of imprisonment, at the bottom of the guidelines range.

(Doc. No. 60 at 1) (information copy of Sixth Circuit order affirming conviction and sentence,

Sixth Circuit Case No. 14-5308). In affirming this sentence, the Sixth Circuit noted:

> The district court's comments at sentencing demonstrate that it considered the
> relevant statutory sentencing factors in choosing [Defendant's] sentence. The
> district court acknowledged [Defendant's] arguments that his age and health issues
> warranted a downward variance but explained that a downward variance was not
> warranted due to [Defendant's] extensive criminal history. Instead, the district court
> concluded that those considerations warranted a sentence at the low end of the
> guidelines range. The record does not demonstrate any error with respect to the

procedural or substantive reasonableness of [Defendant's] sentence.

*Id.* at 3.

The instant Motion followed. As of now, the Government indicates, Defendant has served only 95 of the 262 months of his sentence. (Doc. No. 69 at 20). In response, Defendant notes that his sentence to be served would be only 223 months if he ultimately receives full credit for good time served, as he presently appears on track to do. (Doc. No. 74 at 6-7). In terms of percentage of sentenced served to date, therefore, Defendant is at approximately 36 or 43 percent, respectively.

## LEGAL STANDARDS FOR "COMPASSIONATE RELEASE"

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[2] the district court may under certain circumstances grant a defendant's motion for compassionate release if what the Court will call the "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier."

Once it properly can act on a motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[3]

---

[2] That paragraph of Section 603 provides:

(b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE
RELEASE.—Section 3582 of title 18, United States Code, is amended—
    (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

[3] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is only 63.

only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that "extraordinary and compelling reasons" exist to justify release under the statute. *United States v. Hayward*, No. CR 17-20515, 2020 WL 3265358, at *1 (E.D. Mich. June 17, 2020). And the Court does not write on a clean slate in considering what qualifies as "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission, in promulgating these policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a sentencing reduction unless "such a reduction is consistent with applicable policy statements issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[4]

---

[4] In *Booker*, the Supreme Court found unconstitutional (*i.e.*, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to as "mandatory," meaning that sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

Together, U.S.S.G. § 1B1.13 and its application note do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling circumstances" to apply in (and only in) situations falling within one or more of five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 n.1(A)(i)-(ii), (B), (C) & (D).[5] Second, they prescribe additional requirements for obtaining a sentence reduction where the defendant does meet the threshold requirement of "extraordinary and compelling circumstances."[6] Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that "any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is consistent with this policy statement." *Id.* at n.5.[7]

If the court does find these (two or three depending on how one looks at it) requirements satisfied, the defendant has met the basic eligibility for compassionate release. But even then, the Court does not automatically or necessarily grant the motion for a reduction; instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may

---

[5] The Application Note also contains various other instructions for considering whether extraordinary and compelling circumstances exist. Such instructions need not be discussed here, as the Court herein resolves the Motion without reference to whether Defendant has established "extraordinary and compelling  reasons" in any event.

[6] It is important to note that these other requirements—being, after all, *requirements*—are mandatory. That is to say, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1(A).

[7] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to ensure that the Sentencing Commission's criteria for a sentencing reduction expressly both: (a) included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

The (familiar) sentencing factors set forth in Section 3553(a) include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
ii) [in effect at the time of sentencing]

(5) any pertinent policy statement—
A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and
B) [and in effect at the time of sentencing]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Relevant to factor number (5), as discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying

five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) the defendant is suffering from a terminal illness; or (ii) the defendant is suffering from a serious physical or medical condition, or serious functional or cognitive impairment, or deteriorating physical or mental health due to the ageing process, that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. *See* U.S.S.G. § 1B1.13 n.1(A). The next two categories relate to defendants over 65 and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

As for the last of the five categories, the Application Note describes it as encompassing the situation where, "*[a]s determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D) (emphasis added).

<u>THE PARTIES' RESPECTIVE POSITIONS</u>

In the Motion, Defendant relies on the extant COVID-19 pandemic, his age, and his medical history. As Defendant describes it, he

> survived triple-bypass heart surgery and has high-blood pressure. He has also suffered from hepatitis C, which damaged his liver. In 2019, he underwent chemotherapy for prostrate [sic] cancer. He currently reports having had a great deal of blood in his stool since the beginning of 2020. He concludes that his age and medical conditions put him at high risk of serious complications from Covid-19, and he is at a BOP facility already showing significant spreading of the virus.

(Doc. No. 63 at 1). He claims that this combination constitutes "extraordinary and compelling reasons." He concedes that USP Atlanta has not reported skyrocketing numbers of COVID-19 cases, (Doc. No. 74 at 5), but states that "the virus is in fact presently circulating in USP Atlanta, meaning that [Defendant] runs a substantial risk of infection and, hence, serious complications." (*Id.* at 5-6). And he speculates that it "is only a matter of time before a facility like USP Atlanta,

where the virus is certainly already present, becomes a hot spot for the virus, with cases growing exponentially." (Doc. No. 63 at 7).

The Government argues in response that the Defendant has failed to show extraordinary and compelling circumstances as required by U.S.S.G. § 1B1.13(1). (Doc. No. 69 at 14-19). In addition, the Government correctly notes that under U.S.S.G. § 1B1.13(2), "this Court must deny a sentence reduction unless it determines the defendant 'is not a danger to the safety of any other person or to the community.'" (*Id*. at 19). In the Government's view, this determination cannot be made as to Defendant. The Government further suggests that even if such determination could be made, the Motion should be denied because the factors under Section 3553(a) militate against granting the Motion.

## ANALYSIS

The stage is thus set for the Court to decide the Motion. The Court will address the applicable issues in turn: (a) whether Defendant is eligible—or, more precisely, eligible to be further considered—for compassionate release due to alleged existence of "extraordinary and compelling reasons" and the alleged absence of a danger to other persons or the community he would present if released; and, alternatively, if one were to answer this question in the affirmative, (b) whether, upon further consideration (*i.e.*, consideration of the factors set forth in 18 U.S.C. § 3553(a)), the Motion should be granted.

### I.    EXHAUSTION REQUIREMENTS

In an opinion issued not long ago, the undersigned concluded that a district court cannot disregard the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Edwards*, No. 3:13-CR-00012-1, 2020 WL 1987288, at *11 (M.D. Tenn. Apr. 27, 2020). And in an opinion issued thereafter, the Sixth Circuit confirmed that a district court may not disregard the

exhaustion requirement. *See United States v. Alam*, -- F. App'x --, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020). Accordingly, any request for compassionate release made to a district court is premature until a "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).

In the present case, after reviewing multiple briefs, the Court concludes that in asserting his satisfaction of the exhaustion requirements, Defendant at this point really relies exclusively on a request for compassionate release dated on or about March 1, 2020 (Doc. No. 74-1), and not the below-referenced alleged April 1 request. It appears that on April 27 (or perhaps April 29), 2020, a BOP "staff member" gave the following "disposition" of this request: "Additional information needed for consideration of compassionate release. [N]ot eligible for home confinement. Refer to PS 5050.50." (Doc. No. 74-1 at 2).

The Government does not address this particular request, but rather addresses only Defendant's alternative claim that he made a request for compassionate release on April 1, 2020. But it is clear what the Government's position would be as to the March 1 request: it is insufficient because it fails to comply with BOP's policy number 5050.50 and 28 C.F.R. § 571.61, which collectively set forth BOP's requirements for a defendant's making of a request for compassionate release. And it is true that Defendant's March 1 request does not comply with those requirements because it does not specify any circumstances justifying compassionate release or provide any proposed release plans. The Government's position is not frivolous; for example, courts have held that a defendant is required to exhaust every *particular* claimed extraordinary and compelling reason by presenting the *factual basis* for the compassionate-release request to the warden. *See,*

*e.g.*, *United States v. Baye*, No. 3:12-CR-00115-RCJ, 2020 WL 2857500, at \*5 (D. Nev. June 2, 2020); *see also id.* ("There is accordingly no other interpretation [of Section 3582(c)(1)(A) in conjunction with 28 C.F.R. § 571.61 *et. seq.*] but that a defendant must present each basis for relief to the warden prior to presenting it to a court."); (Doc. No. 69 at 11). On the other hand, as Defendant correctly notes, "[t]he compassionate-release statute does not direct a prisoner to satisfy any provision of the Code of Federal Regulations." (Doc. No. 74). Indeed, as written, Section 3582(c)(1)(A) certainly leaves open the possibility that a general, non-specific request is sufficient. Ultimately, in the absence of controlling precedent binding on this Court, the Court will not reject Defendant's request as insufficient. It will deem Defendant to have made a sufficient request—a request that BOP received more than 30 days ago. Thus, the exhaustion requirements are satisfied, and the Court may consider the Motion.

## II.  EXTRAORDINARY AND COMPELLING REASONS

In addressing the merits, the Court first must determine whether "extraordinary and compelling reasons" exist for Defendant's compassionate release under the standards set forth by U.S.S.G. § 1B1.13 and its application note. Defendant bears the burden to show that extraordinary and compelling reasons exist warranting his release. *United States v. Shabudin*, No. 11-CR-00664-JSW-1, --- F. Supp. 3d ----, 2020 WL 2464751, at \*3 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at \*3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

In the instant case, Defendant relies upon five underlying circumstances that he claims, when combined with the COVID-19 pandemic, constitute extraordinary and compelling reasons: (1) his age, (2) heart disease, (3) high blood pressure, (4) liver damage, and (5) large quantities of blood in his stool for which he assertedly cannot get treatment. (Doc. No. 63 at 10-11); *see also*

*id.* at 5-6 ("Under Note 1(A), the Court should find that [Defendant's] age and medical conditions, combined with the Covid-19 pandemic, constitute extraordinary and compelling reasons for compassionate release."). Such assertions, as often is the case on compassionate release motions, asks the Court to put itself in the difficult position of making medical assessments it is simply not qualified to make. Where the Court must do so it will, relying on its best interpretation of information that is of record in the case. But so doing is unnecessary in this case because Defendant is not eligible for compassionate release, even if the Court were to find that his age and medical profile constitute extraordinary and compelling reasons, because he poses a danger to other persons or the community.

III.    DANGER TO THE SAFETY OF ANY OTHER PERSON OR THE COMMUNITY.

As noted above, Defendant can be eligible for compassionate release, such that the Court proceeds to an analysis of the factors under 18 U.S.C. § 3553(a) only if he is not a danger to other persons or the community. *See* U.S.S.G. § 1B1.13. "[T]he defendant has the burden of proof on the issue of his lack of danger to others and the community." *See United States v. Rodriguez*, No. 3:95CR772, 2020 WL 3260711, at *1 (N.D. Ohio June 13, 2020). The Court finds that Defendant has not met that burden.

The Court does not presume this merely because Defendant is currently incarcerated for a serious offense. The inquiry is more comprehensive than that, involving most significantly a review of Defendant's entire criminal history. As the Government puts it:

> [Defendant's] criminal record is substantial. He showed no signs of an attempt to live a non-criminal life in four decades, committing violent crime after violent crime. As the Sentencing Court concluded, "it's an understatement to say that [Defendant] has not had respect for the law. He's easily qualified as an armed career criminal. Just punishment is really an aggregation of all this." The Court found that [Defendant's] sentencing guidelines called for an imprisonment term between 262 – 327 months. The Court found that "there certainly has not been success" regarding deterrence in [Defendant's] past. and that, "[g]iven the

extensive and unrelenting criminal conduct, it would be defensible to sentence [Defendant] at some point in the advisory guideline range other than the bottom." Ultimately, the Court determined that due to the age at which the guidelines will place [Defendant] at release, the bottom end of the guidelines was sufficient but not greater than necessary.

Because [Defendant's] crimes are laid out succinctly within the PSR, they will not be repeated and re-described here. Of significance is that [Defendant] never showed any sign of leading a non-criminal life in four decades. The amount of violent convictions [Defendant] has and the consistency at which he committed them is remarkable. His record shows no gap in crime in four decades. As his criminal record demonstrates, there have been multiple instances where he was arrested for several open cases in the system at the same time. He continually picked up new arrests both while awaiting trial in other cases, while under court supervision, and even while on escape from a prison sentence he was supposed to be serving. He had multiple cases going on in the criminal justice system at the same time. There is perhaps no better single indicator of a person's criminality then the fact that he continues to commit crimes even while out on bail or under the court's supervision for either probation or parole. Remarkably, [Defendant] even did so while he was supposed to be in prison. He was last sentenced to ten years' custody in 2007 for a 2006 Robbery incident before this incident, which included the threat of violence to two individuals.

(Doc. No. 69 at 19-20) (citations omitted). The Government's overview is accurate, with the caveat that it is unclear why Defendant was, at the time of the instant offense, not incarcerated in connection with the 2006 robbery; presumably this was the result of parole but the PSR does not say. But it is clear that Defendant committed armed robbery on July 19, 1983 after escaping from custody on July 4, 1983. Defendant has been sentenced on 20 different occasions as an adult, over the course of 41 years. Even for a four-decade period, the number is unusually high, especially given how much time Defendant was incarcerated during this period. And, as the Government notes, many of the convictions are for violent offenses and/or otherwise serious offenses. Moreover, the Government rightly focuses on Defendant's demonstrated inability to comply with conditions of release; this characteristic is crucial because it is precisely the absence of compliance with conditions of release that eviscerates the protections put in place to protect society against the danger presented by Defendant. Equally concerning is the fact that apparently, little time elapses

between release from one conviction and arrest on the next charge. And although many of the convictions, violations and sentences are old, there is a distinct pattern that continued unabated until he was arrested in connection with this case less than eight years ago.

With this background, the Court cannot conclude that Defendant would not be a danger to other persons or the community if released given his recidivism as to serious crimes and his history of non-compliance with conditions of release (and escape). To prevail on this issue, Defendant needs a good (or at the very least not bad) record in this regard. And, unfortunately, Defendant's record is poor indeed.

None of this is to diminish the significance of Defendant's reported rehabilitation efforts (and successes) while incarcerated.[8] These are commendable and well may be rewarded in other ways: personal growth and fulfillment; earning maximum credit for good time served; and earning certain inmate privileges not extended to other inmates. But the Court cannot say that Defendant's good behavior in the controlled environment of prison for eight years means that the great danger he posed to other persons for approximately four decades has disappeared and would not manifest itself if Defendant were released. This is so even when his rehabilitation progress is combined with his advancing age. It is true that age (almost) 64 is associated statistically with a reduced risk of recidivism. But so is age 56 by all accounts (albeit presumably to a lesser degree),[9] and Defendant

---

[8] As Defendant describes it, without dispute from the Government, "He has finally earned his GED, he earns positive work reviews, and he is considered a 'model' prisoner and a 'mentor' for younger inmates. He has received no disciplinary actions." (Doc. No. 63 at 12).

[9] For example, the re-arrest rate (which over a large statistical sample surely serves as a good proxy for re-offending rate) for violent offenders in the age category of "older than 50" was reported in recent years to be 60.4 percent, whereas in the next lowest age category (51-50) it was 36.4 percent. United States Sentencing Commission, *Recidivism Among Federal Violent Offenders* (Jan. 2019) at 16, available at https://www.ussc.gov/research/research-reports/recidivism-among-federal-violent-offenders. Notably, the statistics reflect recidivism among federal convicts who have prior violent convictions somewhere in their past  but whose instant offense of conviction was not for a violent crime. *See id.* at 5. The Court perceives that Defendant fits into this category of convicts inasmuch as his instant offense of conviction was for mere illegal possession of a weapon, irrespective of the fact that he clearly threatened violence in connection with the possession at issue. In any event, very similar percentages for these two

committed the instant offense despite being (within a month of) that age. Ultimately, Defendant's rehabilitation and age are not enough for the Court to say that Defendant has met his burden to show that he would not be a danger if released.

It is also significant that Defendant's release plan does not suggest that it would help reduce Defendant's risk of danger to others or the community. His plan is to reside with his son, who is a convicted felon on release (presumably parole) from a ten-year sentence. This is an arrangement that would raise the risk of recidivism—a reality reflected by the standard condition of supervised release (imposed on Defendant in this case) that the defendant not associate with any felon absent the probation officer's approval.

IV.    SECTION 3353(a) FACTORS

Although Defendant does not qualify for compassionate release, irrespective of how the Section 3553(a) factors apply to him, the Court will note several of the Section 3553(a) factors that cut against compassionate release for him.

*The history and characteristics of the Defendant.* As suggested above, Defendant's criminal history cuts very heavily against him. This is offset, but only somewhat, by apparent rehabilitation and his advancing age.

For the same reason and to the same extent, *the need to protect the public from further crimes of the defendant* also cuts against Defendant.

*The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor

---

age categories were reported for federal convicts whose instant offense of conviction was for a violent offense. *See id.* at 26. In addition, the re-arrest rate for all male offenders in the age category 50 to 59 (29.2 percent) was relatively recently reported to be much lower than for all other age categories except age 60 and older (17.2 percent). *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), at 24, available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

of compassionate release for Defendant. The focus in this case plainly is on the need for medical care. Typically, in original sentencings, the "need to provide the defendant . . . with needed medical care" relates to the Court's recommendations to BOP as to what medical treatment should be considered and where the sentence should be served. In the instant context, though, it is fairly construed to refer more generally to the need to assess whether Defendant's medical condition can be adequately safeguarded in a BOP facility. Defendant claims that the answer is no, pointing to the risk of COVID-19 infection at the facility where he is incarcerated and to his medical condition, which he says renders him especially vulnerable to bad outcomes should he become infected.

The Court will not act like it knows the extent to which Defendant's chances of infection would be lower if he is released than if he stays in BOP custody, or how much more likely a bad outcome upon infection would be for him as opposed to someone with a more typical medical profile. As matter of sheer epistemology, the undersigned cannot and does not know such things; this is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as they seem to have reversed themselves on numerous issues over time.[10] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been and remain in constant flux, and it would be folly for the Court to rely blindly on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

---

[10] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; and the extent to which COVID-19 may be transmitted via contact with inanimate surfaces.

Having said that, the Court is willing to accept that Defendant is at substantial risk of COVID-19 infection at USP Atlanta, even though a severe outbreak apparently has not yet occurred there. The Court is also willing to accept that Defendant's age and medical conditions make him prone to relatively bad outcomes in case of infection.

But that does not mean that these circumstances ultimately support compassionate release. For one thing, the Court would merely be speculating as to the extent of the risk of infection at USP Atlanta and as to the likelihood of a bad outcome upon inspection. For another thing, to say the least, it is not like there in no substantial risk of infection outside of BOP custody. For example, in Davidson County, Tennessee (where Defendant proposes to reside if released), the Tennessee Department of Health reports a total of 8,062 "confirmed or probable" cases of COVID-19 as of June 24, 2020. *See* https://www.tn.gov/content/tn/health/cedep/ncov/data.html (last accessed June 24, 2020). And it is a matter of public record that the infection rate is hardly plummeting at present; quite the contrary. And as is also a matter of public record (and undeniable truth in the undersigned's personal experience), these cases have accrued despite substantial steps to keep the infection rate down. So there is no good basis to believe that Defendant's release is likely *in actuality*—not just theory—to reduce his risk of infection from COVID-19.

Defendant also has failed to show that he actually, not just theoretically, will fare better outside of BOP custody if he were to be infected with COVID-19. For example, the Court cannot conclude he would receive better medical care to combat a COVID-19 infection outside of BOP custody. As for Defendant's underling medical conditions upon which he relies, likewise, the Court cannot conclude that they would be better managed outside of BOP custody.

As the Government aptly notes:

> The release plan in his submission to this Court fails to include any information regarding how he will obtain medical care for his ailments outside of prison and

how he would pay for it . . .. Without it, release would run antithetical to the compassionate release law, which is designed to ensure the health of individuals. [Defendant] has neither shown a plan nor means to obtain medical care. Without a plan or means to obtain one, release could result in a shorter and unhealthy life.

(Doc. No. 69 at 18).

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* also cuts against Defendant. In the Court's view, there is little doubt that the amended sentence Defendant now seeks would result in a very disparately low sentence compared to defendants convicted of (relatively) similar conduct with similar criminal history. As noted above, Defendant has served 95 months but has either 128 or 167 months (depending on whether good-time credit is factored in) left to serve. This fact may weigh against his release. *See United States v. Kincaid*, -- F. App'x --, 2020 WL 2521303, at *1-2 (6th Cir. May 18, 2020) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions). As the Court views it, this fact raises the possibility of a major unwarranted sentence disparity. After all, Defendant's sentence was at the bottom of the guideline range. And even though it was imposed under a non-mandatory (*i.e.*, post-*Booker*) guideline range, the Court can and here does perceive that a revised sentence so far below the guideline range poses a major risk of sentencing disparity versus more healthy offenders who otherwise are similarly situated. Given the very high guideline range, an amended sentence of roughly 95 months would indeed be unusually low for this kind of crime by a (career) offender in Criminal History Category VI. Even if Defendant's sentence reduction could be deemed "warranted" based on "extraordinary and compelling reasons" arising from his health profile, it would be *unwarranted* for healthy similarly situated inmates to serve at

least *a decade* more than Defendant merely because (perhaps to their great credit)[11] they are healthy. For these reasons, the Court finds that granting compassionate release would result in a sentence that runs afoul of this sentencing factor.

CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g., United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable here, given that if released, Defendant would present a danger to other persons or the community. Alternatively, even if compassionate release were potentially available, it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, the Motion (Doc. No. 63) is **DENIED**.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[11] It seems undeniable that there is a connection between good health and laudable, prudent lifestyle choices. Thus, such good choices can help explain the relative good health even of individuals who have made poor choices in different spheres that have landed them in prison. Notably, the Court does not mean to imply here in any way that Defendant's health issues are a result of any choices he has made or is his fault in any way.